**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| K.S., an individual,[1]<br><br>Plaintiff,<br><br>vs.<br><br>(1) G6 HOSPITALITY LLC<br>(2) G6 HOSPITALITY FRANCHISING LLC<br>(3) DHJR HOSPITALITY, LLC<br>(4) ATIT CORPORATION<br>(5) S&S REALTY, LTD.<br>(6) RED LION HOTELS FRANCHISING, INC.<br>(7) SHRI GOPI, LLC<br>(8) RED ROOF INNS, INC.<br>(9) RED ROOF FRANCHISING, LLC<br>(10) UJJAM, LLC<br>(11) LAKE ERIE HOSPITALITY, LLC<br>(12) CHOICE HOTELS INTERNATIONAL, INC.<br>(13) CHOICE HOTELS INTERNATIONAL SERVICES CORP.<br>(14) TIGER CLEVELAND AVON LLC, f/k/a VALUE PLACE AVON OH LLC and WOODSPRING SUITES CLEVELAND AVON LLC,<br>(15) NIMU, LLC<br>(16) LODGING, LLC<br>(17) HMVS, INC.<br>(18) JAI MATA DI, INC. (PRAISE THE LORD)<br>(19) PATEL & PATEL, d/b/a JOURNEY INN<br>(20) A S F INC.<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

[1] Plaintiff K.S. files contemporaneously herewith a Motion to Proceed Under a Pseudonym.

Plaintiff K.S. ("K.S."), proceeding under a pseudonym due to the sensitive nature of the allegations in this case, brings this action against Defendants under the Trafficking Victims Protection Reauthorization Act (TVPRA) and seeks damages as a victim of human trafficking at Defendants' hotels.

## INTRODUCTION

1. K.S. was trafficked for sex at multiple hotels in Elyria, Ohio from 2017-2021. Outside of Elyria, she was also trafficked from Avon to Sandusky.

2. Multiple other women were trafficked at the same hotels, at the same time, by the same trafficker.

3. The trafficking involved violence, drugs, and multiple sex buyers coming and going from the hotels every single day.

4. Hotels profited from the sex trafficking at their properties, despite knowledge that women were being forced, coerced, and defrauded into engaging in commercial sex.

5. Hotels at times actively participated in the trafficking of K.S. and others.

6. K.S. brings this action under the TVPRA seeking damages.

## PARTIES

7. **Plaintiff K.S.** is a natural person who is a current resident and citizen of the State of Ohio. All of her trafficking described in this Complaint occurred within the Northern District of Ohio. K.S. intends on filing a motion to proceed in this litigation under pseudonym given the nature of the allegations in this action.

8. **G6 Hospitality LLC** is a Delaware limited liability company whose principal place of business is in Carrolton, Texas. IT is now and has since 2012 been registered to do business in the State of Ohio. G6 Hospitality LLC owns the Motel 6 brand, coordinates

centralized functions for franchised hotels, including brand management, marketing/advertising, sales, oversight and operation of property management and reservations systems, and customer service.

9. **G6 Hospitality Franchising LLC** is a Delaware limited liability company whose principal place of business is in Carrollton, Texas. It is now and has since 2005 been registered to do business in the State of Ohio. G6 Hospitality Franchising LLC is the G6 entity that enters into franchise agreements with owners/franchisees, exercises oversight and control of Motel 6 hotels, assists with new openings (including trainings), and ensures franchisee compliance with brand standards.

10. **DHJR Hospitality, LLC** is now and has been registered as an Ohio limited liability company with its current principal place of business at 704 N. Leavitt Rd., Amherst, Ohio. It has registered with the Ohio Secretary of State the trade name "Motel 6 of Amherst #4742." At all relevant times, DHJR Hospitality, LLC owned and operated the Motel 6 in Amherst, where K.S. was trafficked. During that time, DHJR Hospitality, LLC was a franchisee of G6 Hospitality LLC and G6 Hospitality Franchising LLC.

11. **ATIT Corporation** is now and has been registered as an Ohio limited liability company with its current principal place of business at 32751 Lorain Rd., North Ridgeville, Ohio. It has registered with the Ohio Secretary of State the trade name "Motel 6 / North Ridgeville, Ohio." At all relevant times, ATIT Corporation owned and operated the Motel 6 in North Ridgeville, where K.S. was trafficked. During that time, ATIT Corporation was a franchisee of G6 Hospitality LLC and G6 Hospitality Franchising LLC.

12. **S&S Realty, LTD** is now and has been registered as an Ohio limited liability company with its current principal place of business at 1210 Sycamore Line, Sandusky, Ohio. At

all relevant times, S&S Realty, LTD owned and operated the Motel 6 in Milan, Ohio where K.S. was trafficked. During this time, S&S Realty, LTD was a franchisee of G6 Hospitality LLC and G6 Hospitality Franchising LLC.

13. **Red Lion Hotels Franchising, Inc.** is a privately held Washington corporation with its principal place of business in Denver, Colorado. It is now and has been registered to do business in the State of Ohio. Red Lion Hotels Franchising, Inc. owns the Knights Inn brand, enters into franchise agreements with owners/franchisees, exercises oversight and control of Knights Inn hotels, coordinates centralized functions for franchised hotels, including brand management, marketing/advertising, sales, oversight and operation of property management and reservation systems, and customer services.

14. **Shri Gopi, LLC** is an Ohio limited liability company with its principal place of business located at 523 Griswold Rd., Elyria, Ohio 44035. At all relevant times, Shri Gopi, LLC owned and operated the Knights Inn where K.S. was trafficked. During this time, Shri Gopi, LLC was a franchisee of Red Lion Hotels Franchising, Inc.

15. **Red Roof Inns, Inc.** is a privately held Delaware corporation with its principal place of business at 7815 Walton Pkwy, New Albany, Ohio. RRI manages the Red Roof brand and operates numerous Red Roof locations through its subsidiary RRI West Management, LLC.

16. **Red Roof Franchising, LLC** is a Delaware limited liability company with its principal place of business at 7815 Walton Pkwy, New Albany, Ohio. Red Roof Franchising, LLC enters into franchise agreements with owners/franchisees, assists with new openings (including trainings), and ensures franchisee compliance with brand standards. Red Roof Franchising, LLC provides field trainers to train employees on Red Roof procedures, policies,

and the property management system. It provides hands-on support, feedback, training, and education aimed at protecting franchisee investment and increasing profitability.

17. **UJJAM, LLC** is an Ohio limited liability company with its current principal place of business located at 11303 U.S. Route 250 North Milan, Ohio 44846. In 2014 it registered with the Ohio Secretary of State the fictitious name "Red Roof Inn Elyria Ohio." At all relevant times, UJJAM, LLC owned and operated the Red Roof Inn in Elyria where K.S. was trafficked. During that time, UJJAM, LLC was a franchisee of Red Roof Inns, Inc. and Red Roof Franchising, LLC.

18. **Lake Erie Hospitality, LLC** is an Ohio limited liability company with its current principal place of business at 8606 Hayes Ave., Sandusky, Ohio. At all relevant times, Lake Erie Hospitality, LLC owned and operated the Red Roof Inn in North Milan where K.S. was trafficked. During that time, Lake Erie Hospitality, LLC was a franchisee of Red Roof Inns, Inc. and Red Roof Franchising, LLC.

19. **Choice Hotels International, Inc.** is a Delaware corporation. Choice Hotels International, Inc. owned the WoodSprings Suites brand, exercised oversight and control of Comfort-branded hotels, and acted as the franchisor of the hotels.

20. **Choice Hotels International Services Corp.** is a Delaware corporation and a wholly owned subsidiary of Choice Hotels International, Inc. Upon information and belief, at all relevant times, Choice Hotels International Services Corp. provided franchise support and operational services for WoodSprings Suites-branded hotels.

21. **Tiger Cleveland Avon LLC, f/k/a Value Place Avon OH LLC and Woodspring Suites Cleveland Avon LLC ("Tiger Cleveland")** is a foreign limited liability company registered to do business in Ohio. At all relevant time, Tiger Cleveland owned and

operated the WoodSprings Suites in Avon, where K.S. was trafficked. During that time, Tiger Cleveland was a franchisee of Choice Hotels International, Inc. and Choice Hotels International Services Corp.

22. **NIMU, LLC** is an Ohio limited liability company with a principal place of business at 910 Lorain Blvd. Elyria, Ohio 44035. Starting on October 29, 2020, NIMU LLC owned and operated the Sprucewood Inn in Elyria, where K.S. was trafficked. NIMU, LLC owned and operated the hotel without the control of any franchisor.

23. **Lodging, LLC** is an Ohio limited liability company with a principal place of business at 910 Lorain Blvd. Elyria, Ohio 44035. Prior to October 29, 2020, Lodging, LLC owned and operated the Sprucewood Inn in Elyria, where K.S. was trafficked. Lodging, LLC owned and operated the hotel without the control of any franchisor.

24. **HMVS, Inc.** is a dissolved entity. At all times relevant hereto, HMVS, Inc. owned and operated the Sunset Motel in Oberlin, Ohio, where K.S. was trafficked. HMVS, Inc. owned and operated the hotel without the control of any franchisor.

25. **Jai Mata Di, Inc. (Praise the Lord)** is an Ohio corporation with a principal place of business of 550 Griswold Rd Elyria, Ohio 44035. At all times relevant hereto, Jai Mata Di, Inc. (Praise the Lord) owned and operated The Camelot, a hotel where K.S. was trafficked. Jai Mata Di, Inc. (Praise the Lord) owned and operated the hotel without the control of any franchisor.

26. **Patel & Patel, d/b/a Journey Inn** is an Ohio partnership with its previous principal place of business at 888 Lorain Blvd Elyria, Ohio 44035. At all times relevant hereto, Patel & Patel owned and operated the Journey Inn, where K.S. was trafficked. Patel & Patel owned and operated the hotel without control of any franchisor.

27. **A S F Inc.** is an Ohio corporation with its principal place of business at 1724 Lorain Blvd Elyria, Ohio 44035. At all times relevant hereto, A S F Inc. owned and operated the Motel 9, where K.S. was trafficked. A S F Inc. owned and operated the Motel 9 without control of any franchisor.

28. **Naming Conventions.** For convenience, throughout this Complaint, Defendants will be referred to as their true name or as follows:

a) "Defendants" are all Defendants in the action.

b) "Franchisors" are G6 Hospitality LLC, G6 Hospitality Franchising LLC, Red Lion Hotels Franchising, Inc., Red Roof Inns, Inc., Red Roof Franchising, LLC, Choice Hotels International, Inc., and Choice Hotels International Services Corp.

c) "Franchisees" are DHJR Hospitality, LLC, ATIT Corporation, S&S Realty, LTD, Shri Gopi, LLC, UJJAM, LLC, Lake Erie Hospitality, LLC, and Tiger Cleveland.

d) "G6 Franchisors" are G6 Hospitality LLC and G6 Hospitality Franchising LLC.

e) "G6 Franchisees" are DHJR Hospitality, LLC, ATIT Corporation, and S&S Realty Ltd.

f) "Red Lion Franchisor" is Red Lion Hotels Franchising, Inc.

g) "Red Lion Franchisee" is Shri Gopi, LLC.

h) "Red Roof Franchisors" are Red Roof Inns, Inc. and Red Roof Franchising, LLC.

i) "Red Roof Franchisees" are UJJAM, LLC and Lake Erie Hospitality, LLC.

j) "Choice Franchisors" are Choice Hotels International, Inc. and Choice Hotels International Services Corp.

k) "Choice Franchisee" is Tiger Cleveland.

l) "Independent Operators" are NIMU, LLC, Lodging, LLC, HMVS, Inc., Jai Mata Di, Inc. (Praise the Lord), Patel & Patel, d/b/a Journey Inn, and A S F Inc.

## VENUE AND JURISDICTION

29. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

30. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to K.S.' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. National Hotel Franchisors Exercise Extreme Control Over Franchisees.

31. Franchisors had the right to control and exercised that right to control their respective Franchisees through franchise agreements that adopted and incorporated mandatory brand standards.

32. Franchisors used these agreements to dictate to their respective Franchisees what they could do and could not do in operating the properties.

33. Although Franchisees are responsible for carrying out the day-to-day operations at their hotels, they are contractually obligated to do so in strict conformity with brand standards that are unilaterally created, imposed, and enforced by Franchisors. Throughout the course of the

relationship, the Franchisors retained discretion to modify the brand standards, and the Franchisees would have to strictly comply with those modifications.

34. Brand Standards demand compliance with all safety and security measures dictated by the brand which may include security cameras, employing security personnel, responses to reports of criminal activity, etc. The Franchisees are tasked with enforcing the safety and security measures, but they must adhere to the brand standards imposed by the Franchisors or otherwise be in violation of the franchise agreement and risk termination of the franchise itself.

35. Franchisors also had and have the authority under their franchise agreements to require their respective Franchisee(s) to train hotel employees on the detection, deterrence, and reporting of sex trafficking on the branded properties. This includes the manner, frequency, length, and content of the trainings. Franchisees would then have to train its employees or would be in violation of the franchise agreement and risk termination of the franchise itself.

36. Defendants did not implement or require implementation of measures to stop sex trafficking at their properties, and allowed their properties to be used to facilitate the criminal enterprise, from which Defendants profited.

37. Franchisees give up control of their hotel, as well as a substantial share of the hotel's revenue to Franchisors.

**B. Sex Trafficking, In General**

38. Sex trafficking is a form of modern day slavery. It is a pervasive and growing problem in the United States and is widely recognized as a serious public health and human rights crisis.

39. Traffickers exploit adults and children by using force, threats of force, fraud, and coercion to compel them to engage in commercial sex acts against their will.

40. Congress and many state legislatures have recognized that sex trafficking cannot be effectively combated through criminal prosecution of traffickers and sex buyers alone.

41. Since 2003, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. *et seq.*, has provided sex trafficking victims with a civil remedy against the perpetrators of criminal sex trafficking.

42. In 2008, Congress extended the TVPRA's civil remedy to create liability for those who benefit financially from their participation in a venture that they know or should know engages in sex trafficking. 18 U.S.C. §§ 1594 (a), 1595(a).

43. Today, a sex trafficking survivor has the right to file a civil action and recover damages against both the perpetrators of her trafficking, as well as against those who benefited financially from her trafficking.

### C. The Hospitality Industry Has Long Recognized that Hotels Are Common Venues for Sex Trafficking and that Hotel Employees Can Identify Sex Trafficking through Observable Indicators.

44. Hotels provide private rooms to transient individuals, typically on a short-term basis.

45. These private rooms contain bathrooms, showers, and beds that are consistently cleaned and stocked by hotel staff.

46. The nature of these hotel operations creates an opportunity for sex traffickers to exploit woman by forcing or coercing them to engage in commercial sex in the hotels.

47. Hotel employees and staff are uniquely positioned to recognize signs of sex trafficking because they regularly interact with hotel guests and observe activity occurring in

guest rooms, hallways, parking lots, and other common areas that traffickers often utilize as part of their trafficking operations.

48. In 1949, the United Nations adopted its Convention for the Suppression of the Traffic in Persons and of the Exploitation of Prostitution of Others. This recognized the connection between prostitution and trafficking: "[P]rostitution and the accompanying evil of the traffic in persons for the purpose of prostitution are incompatible with the dignity and worth of the human person and endanger the welfare of the individual, the family and the community."

49. The U.N. introduced its Blue Heart Campaign in 2009 and sought to educate the public and the private sector on identifying and combatting human trafficking.

50. Around the same time of the U.N.'s Blue Heart Campaign, the Department of Homeland Security launched the Blue Campaign with a similar goal of educating the public and the private sector on identifying and combatting human trafficking.

51. Both the Blue Heart Campaign and the Blue Campaign have identified the hospitality industry as an industry used to facilitate sex trafficking.

52. Before and during the time in which K.S. was trafficked, anti-trafficking organizations, hospitality-industry groups, law enforcement, academics, and journalists publicly identified hotels and motels as common locations where sex trafficking was occurring. These organizations and individuals wrote articles, disseminated guidance, educational materials, and training specifically directed to the hospitality industry and the public at large concerning the recognition and reporting of sex trafficking.

53. Industry trade groups and state hotel lodging associations sponsored presentations and held committee meetings to address sex trafficking as early as 2011.

54. Industry trade groups also offered sex trafficking training videos as early as 2012.

55. Organizations such as ECPAT, BEST, and Polaris Project reached out to Franchisors to alert them to the major problem of sex trafficking at their hotels years before K.S. was trafficked.

56. Defendants actively monitored online travel reviews such as TripAdvisor, Google Reviews, Yelp, etc. These customer reviews often included information explicitly and implicitly claiming that sex trafficking was happening at Franchisors' properties prior to and during K.S.'s trafficking.

57. Defendants now know and have known for more than a decade that sex traffickers have the opportunity and in fact do force and coerce woman to have sex for money at Defendants' properties.

58. The rise of the internet has only enhanced the use of hotels for sex trafficking. Now, a trafficker can post an advertisement online for one of his victims, and a sex buyer can show up at the hotel shortly after interacting with the ad.

59. Each Defendant had the ability to deter and reduce sex trafficking at their properties and failed to do so.

60. Specifically, each Defendant had the ability to stop the sex trafficking of K.S. at their property and failed to do so.

61. The red flags of sex trafficking were well-known to constituents of the hotel and motel industry, including Defendants, long before K.S. was ever trafficked. These red flags include:

a. Cash or prepaid cards used for room payments;

b. Multiple rooms rented by the same individual;

c. Refusal of housekeeping services (including frequent use of the "Do Not Disturb" sign);

d. Frequent requests for additional towels and linens;

e. Excessive short-term visitors to guest rooms;

f. Persons entering or exiting the hotel through side or rear entrances;

g. Guests with few personal items;

h. Guests wearing provocative or inappropriate clothing;

i. The presence of illegal drugs, alcohol, or sex-related paraphernalia;

j. Persons congregating outside guest rooms, in the lobby, or in the parking lot; and

k. Persons exhibiting visible injuries, fear, anxiety, restricted movement, or apparent control by another person.

62. In 2004, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct in the United States. It identifies six steps companies can take to prevent child sex trafficking, including training on detection and reporting of sex trafficking, and reporting annually on the company's implementation efforts.

63. ECPAT has also identified hotel-specific best practices for preventing sex trafficking, including periodic training on trafficking indicators and responding to suspected trafficking; training for all new associates; strategic use of security cameras to capture all guests and visitors; monitoring online sex ads for advertising at the property; blocking internet access for websites routinely used for sex ads; logging all visitors; and implementing a no-cash policy.

**D. K.S. Is a Survivor of Sex Trafficking at the Defendants' Hotels.**

64. K.S. was trafficked by Steven Gilbert (hereinafter "Gilbert").

65. K.S. met Gilbert in 2016.

66. On Christmas Day, 2016, Gilbert had his name tattooed on K.S.'s stomach.

67. By 2017, Gilbert began posting ads on the internet for men to have sex in exchange for money with K.S.

68. Men answered the ads, and K.S. was compelled by Gilbert through a consistent pattern of force, fraud, and coercion at each hotel listed below to have sex with the men.

69. K.S. was trafficked by Gilbert at the following hotels:

a. The Motel 6 located at 704 N. Leavitt Rd Amherst, OH 44001

   i. Franchisors: G6 Franchisors

   i. Franchisee: DHJR Hospitality, LLC

   ii. Time Period: 2017-2021

b. The Motel 6 located at 32751 Lorain Rd. North Ridgeville, OH 44039

   i. Franchisors: G6 Franchisors

   i. Franchisee: ATIT Corporation

   ii. Time Period: 2017-2021

c. The Motel 6 located at 11406 U.S. Route 250 North Milan, Ohio 44846

   i. Franchisors: G6 Franchisors

   i. Franchisee: S&S Realty, Ltd.

   ii. Time Period: 2020-2021

d. The Knights Inn located at 523 Griswold Rd. Elyria, Ohio 44035

   i. Franchisor: Red Lion Franchisor

   i. Franchisee: Shri Gopi, LLC

ii. Time Period: 2017-2021

e. The Red Roof Inn located at 621 Midway Blvd. Elyria, Ohio 44035

i. Franchisors: Red Roof Franchisors

i. Franchisee: UJJAM, LLC

ii. Time Period: 2017-2021

f. The Red Roof Inn located at 11303 U.S. Route 250 North Milan, Ohio 44846

i. Franchisors: Red Roof Franchisors

i. Franchisee: Lake Erie Hospitality, LLC

ii. Time Period: 2020-2021

g. The Woodsprings Suites located at 1610 Moore Rd Avon, Ohio 44011

i. Franchisors: Choice Franchisors

i. Franchisee: Tiger Cleveland

ii. Time Period: 2019-2021

h. The Sprucewood Inn located at 912 Lorain Blvd Elyria, Ohio 44035

i. Independent Operator 1: NIMU LLC

i. Independent Operator 2: Lodging, LLC

ii. Time Period: 2019-2021

i. The Sunset Motel located at 44077 Oberlin Elyria Road Oberlin, Ohio 44074

i. Independent Operator: HMVS, Inc.

i. Time Period: 2017-2018

j. The Camelot located at 550 Griswold Rd Elyria, Ohio 44035

i. Independent Operator: Jai Mata Di, Inc. (Praise the Lord)

ii. Time Period: 2018-2020

k. The Journey Inn located at 888 Lorain Blvd Elyria, Ohio 44035

i. Independent Operator: Jai Mata Di, Inc. (Praise the Lord)

i. Time Period: 2019-2020

l. The Motel 9 located at 1724 Lorain Blvd Elyria, Ohio 44035

i. Independent Operator: A S F Inc.

ii. Time Period: 2018-2021

70. While K.S. was trafficked at each hotel, to the best of her recollection, at least once in each year of the "Time Period[s]" listed above. She was not trafficked each and every day at each hotel during that span of time. Instead, she spent at least one night at a time and could have stayed as long as a month or two at any of the hotels listed above. Booking information is in the possession of the Defendants and will shed light on more specific timeframes.

**E. The Hotels Should Have Known That K.S. Was Trafficked at Their Properties.**

71. Defendants ignored numerous, repeated, obvious signs of sex trafficking of K.S. and other victims.

72. K.S. was not Gilbert's only victim. Gilbert was actively trafficking multiple women from 2017-2021 at the same hotels during the same time periods. The women often shared a hotel room or had rooms in close proximity to one another. All women were subject to force, threats of force, fraud, or coercion as means of control so that they would engage in commercial sex. The victims did not get to keep any of the money from the commercial sex acts.

The money either went entirely to Gilbert or some of the money went to pay the hotel for the room, and Gilbert got the rest.

73. At each hotel, K.S. encountered the same staff and management day after day, month after month, year after year. Hotel staff and management repeatedly saw K.S. (and the other victims), saw how they were treated by Gilbert (as described herein), saw how they were unhealthy and progressively getting worse, and turned a blind eye.

74. Defendants knew or should have known of the ongoing sex trafficking of K.S. and other victims, and had the ability and opportunity to prevent the resulting harm. Despite the knowledge, ability, and opportunity, Defendants took no reasonable steps to investigate, report, or respond to the trafficking occurring on their properties. This caused K.S. to suffer severe and permanent injuries.

75. Gilbert stopped trafficking K.S. in 2021 when he was arrested.

76. Gilbert was charged with and has been convicted of numerous crimes including rape, kidnapping, aggravated robbery, and trafficking in persons.

77. K.S. testified against Gilbert at trial, and the jury convicted him of trafficking K.S. as well as multiple other women.

78. Gilbert is now serving over 170 years to life in prison.

**1. The Method of How Rooms Were Rented is Indicative of Sex Trafficking.**

79. Gilbert would rent hotel rooms under his name, his mother's name, his girlfriend's name, or the rooms were rented under the names of the trafficking victims (including K.S.), so that the sex buyers could purchase and engage in sex with Gilbert's victims.

80. Gilbert would often be present at check-in.

81. Gilbert would arrive in one of the Mercedes he owned, playing loud music, and usually smoking marijuana. He would typically be accompanied by at least one of his trafficking victims, or they would already be in the room if Gilbert was coming to extend the reservation.

82. The rooms were typically paid for with cash or one of Gilbert's credit cards, regardless of whose name was used to book the room.

83. Once a hotel room was rented, sex buyers began to arrive at the hotel, go to the room(s) rented by Gilbert, engage in sex acts with Gilbert's victims for anywhere between 15 minutes and an hour, and then leave the hotel. This pattern repeated itself with multiple sex buyers each day that Gilbert had a hotel room.

84. On any given day, approximately 1-70 sex buyers would come and go from the hotel room(s). The average per day visiting any hotel was around 30 sex buyers.

85. Gilbert would spend a lot of time at the hotels during the days early on during the trafficking period. His time would be spent exerting control over the victims so they would engage in sex trafficking, and also selling drugs out of each hotel.

86. Gilbert's presence at each hotel resulted in multiple drug buyers (who weren't buying sex) showing up at the hotel, buying drugs, and leaving quickly, creating foot traffic that was seen by hotel staff.

87. When Gilbert wasn't selling drugs, he was spending time with his victims who were younger, dressed in sexually provocative clothing, strung out on drugs, malnourished, and sometimes in fear for their life.

88. When there were multiple victims sharing the same room, the other victim(s) would leave the room and would linger in the hotel's common areas or parking lot when K.S. was seeing a sex buyer in the room. If another victim was seeing a sex buyer, K.S. would

similarly leave the room and linger in the hotel's common areas or parking lot. This was visible to hotel employees.

89. If Gilbert was present when a sex buyer arrived, Gilbert would similarly leave the room and linger in the hotel's common areas or parking lot.

**2. Gilbert Used Physical Violence to Control K.S., Forcing Her to Engage in Commercial Sex.**

90. If K.S. didn't do what Gilbert told her to do, he would beat her.

91. Gilbert had screaming confrontations that turned physical with K.S. and other victims at each of the hotels listed above, and in their parking lots. Hotel employees would have seen and heard these confrontations.

92. Gilbert used firearms in his beatings and to intimidate his victims.

93. K.S. would have visible signs of her beatings such as bruising or black eyes while at the hotels listed above in plain sight for hotel employees to see.

94. Other victims would also have visible signs of their beatings such as bruising while at the hotels listed above in plain sight for hotel employees to see.

95. Gilbert would also burn K.S. with his blunts. K.S. would have burn marks on her body visible to hotel employees.

**3. Gilbert Used Drugs to Control K.S., Forcing Her to Engage in Commercial Sex.**

96. As stated, Gilbert was also a drug dealer.

97. K.S. and Gilbert's other victims were drug addicts.

98. Gilbert forced and coerced K.S. and other victims to have sex for money by controlling the combination and quantity of drugs that his addicted victims were given. This allowed Gilbert to control the victims themselves because they would get "dope sick" or experience withdrawal symptoms. He forced the women to need drugs every few hours, and

would withhold drugs if the women were not making enough money in the hotel rooms. If drugs were withheld, the victims became physical sick. He also utilized stimulants to keep the girls awake and energized to see sex buyers.

99. K.S. and other victims were controlled by drugs at each of the hotels listed above. Employees of each hotel would have seen K.S. and other victims under the influence of drugs and would have seen drug paraphernalia such as crack pipes, baggies, needles, and blood-soaked bandages in the hotel rooms.

100. When the victims were sent to a different hotel to be trafficked, they would leave needles, crack pipes, and baggies that had drug residue for hotel staff to clean up. The victims would then return to that same hotel some time later, after the hotel staff had seen what was previously left inside of the rooms.

101. The same employees who cleaned up the drugs and drug paraphernalia would also have seen multiple used and unused condoms, lubrication, increased foot traffic from sex and drug buyers, and trafficking victims who exhibited signs of physical abuse in the same room.

102. The drugs, in combination with a lack of food and drink, made K.S. and other victims appear malnourished and sick while she stayed at each of the hotels.

103. K.S. and the other trafficking victims often were dressed scantily or provocatively despite also appearing sick, malnourished, and strung out on drugs.

104. Gilbert would either deliver the drugs to the hotels, or K.S. or another victim would go get the drugs from Gilbert and bring them to the hotel.

**4. K.S. Had A Visible, Gruesome Arm Injury at All of the Hotels.**

105. As stated, Gilbert used drugs to control K.S. and force her to engage in commercial sex.

106. K.S. injected these drugs into her own body.

107. K.S.'s repeated injection of drugs led to deterioration of the veins in her arm, making it difficult or impossible to inject directly into her veins.

108. Instead, K.S. had to inject the drugs into her skin (a practice referred to as "skin popping").

109. This led to deterioration of the skin on her arm so that, as early as 2017, K.S.'s arm would have visible open wounds.

110. By early-2020, K.S.'s arm became infected.

111. The infection was likely caused by using dirty needles to inject drugs, or general unsanitary conditions in the hotel room.

112. The only way K.S. could get needles to inject the drugs Gilbert was using to control her was through Gilbert. Gilbert would only give K.S. clean needles once every few months.

113. The infection would leak blood and pus.

114. The infection resulted in significant swelling in K.S.'s hand to the point where K.S. could not move her hand.

115. While present at all of the hotels, hotel employees saw the deterioration of K.S.'s arm.

116. The open wounds on K.S.'s arm resulted in a need for consistent changing of bed sheets and towels. The used towels were picked up by employees of the hotels listed above and were stained with blood and pus from K.S's arm.

117. The employees changing the bed sheets and replacing the towels would have seen and smelled an entirely unhealthy environment resulting from K.S.'s arm, while at the same time seeing numerous sex buyers entering the same room each day.

118. K.S. had her arm amputated in late-January of 2021.

119. A few weeks before her arm was amputated, K.S. was in a car accident. The accident was so severe that the bones of her arm were visible to hotel workers.

120. After her arm was amputated, Gilbert picked K.S. up at the hospital, drover her directly to a hotel, and forced her to continue to engage in commercial sex.

**5. Gilbert Defrauded K.S. Into Engaging in Commercial Sex.**

121. Gilbert defrauded K.S. to make her have sex for money by fostering a fraudulent romantic relationship with her. Gilbert described him and K.S. as a "team" and told K.S. that he would save the money she was earning to put into legitimate businesses so that she could stop having sex for money in hotels. None of this was true.

**6. The Defendants Assisted in Gilbert's Trafficking Operation.**

122. Defendants allowed Gilbert to operate at their properties and otherwise supported, assisted, and facilitated his trafficking activities.

123. The Franchisees and Independent Operators would assign rooms in more discreet areas of the hotels so that the trafficking would be both easier for the trafficker to accomplish and less observable to innocent hotel guests.

**7. Specific Hotels Had an Even Higher Degree of Knowledge of and Involvement in the Trafficking.**

124. Staff at the Motel 6 in North Ridgeville told victims they couldn't do "the stuff" they were doing at the hotel, but took no further action.

125. A maintenance man at the Motel 6 in North Ridgeville frequently paid for sex with victims of Gilbert's sex trafficking operation. On at least one occasion, another Motel 6 employee was present when the maintenance man offered to pay money for sex.

126. At the Red Roof Inn in Sandusky, the room rented to K.S. and other victims often shared a wall with the back office and anyone working in the back office would have heard everything going on in the room used for trafficking. This included, but was not limited to, sex buyers that had BDSM, rape, and strangulation fetishes. Workers in the back office would have heard sex buyers having violent and aggressive sex with victims (including K.S.), as well as yelling and screaming during sex.

127. At the Knights Inn, the hotel manager and maintenance man lived on site.

128. Rooms were rented to Gilbert and his victims at the Knights Inn, and those rooms were typically in close proximity to the rooms where the hotel's manager and maintenance man lived.

129. The manager at the Knights Inn demanded sex with Gilbert's victims.

130. The maintenance man at the Knights Inn paid for sex with the victims.

131. Gilbert was known to the manager at the Knights Inn. Gilbert would often request a "construction" room that was not open to the public from the manager. Gilbert would use the "construction" room to violently beat and even rape his victims if they were not following his orders.

**F. Each Defendant Financially Benefitted from the Trafficking of K.S.**

132. While some Defendants are Perpetrators of K.S.'s, they each financially benefited from participation in a venture engaged in K.S.'s trafficking.

133. The Defendants either directly rented rooms and collected payment for those rooms that were used to traffic K.S., or received royalties from the rental of those rooms.

**COUNT 1: Principal/Agent Vicarious Liability of Franchisor Defendants Against G6 Franchisors, Red Lion Franchisor, Red Roof Franchisors, and Choice Franchisors**

134. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

135. At all times relevant hereto, an agency relationship existed between each Franchisor Defendant and their respective Franchisee(s).

136. As alleged above, the Franchisor Defendants had the right to exercise and in fact did exercise wide-ranging operational control over their respective Franchisee(s) through franchise agreements, brand standards, and other brand specifications and requirements.

137. In each instance, the Franchisor Defendant was in a continuous business relationship with its respective Franchisee(s) designed to ensure control and the profitable operation of the subject hotel.

138. In each instance, the Franchisor Defendant was participated in the operation of the respective hotel(s), including operational aspects connected to the acts, omissions, and events that caused K.S.'s harm (e.g., training, safety, security, etc.).

139. In each instance, the Franchisor Defendant stated from the outset of the relationship what each respective Franchisee may and may not do in general and specific terms. This included the right to give interim instruction or direction once the relationship was established by way of purely discretionary amendment of brand standards and other brand requirements, as alleged above.

140. In each instance, the Franchisee assented to this arrangement by entering into the franchise agreement after reviewing franchise disclosure documents and by continuing to operate under the agreement after functioning under the control of its corresponding Franchisor.

141. In each instance, the Franchisor Defendant had the right to control and actually controlled the daily conduct of its respective Franchisee(s) as to hotel operations directly related to K.S.'s harm, including training, hotel internet/Wi-Fi operations, and all aspects of safety and security. The Franchisee Defendants retained autonomy only over operations tangentially related to Plaintiff's harm (e.g., hiring and firing) or totally unrelated to Plaintiff's harm (e.g., paying taxes and administering employee benefits).

142. Although the Franchisee Defendants "carried out" day-to-day operations, they were contractually constrained to do so in strict conformity with brand standards and other requirements dictated unilaterally by their respective Franchisors.

143. The Franchisor Defendants each retained the right to unilaterally modify brand standards, which would have immediate and binding prospective application, i.e., to give interim instructions and direction during their continuous business relationship with their respective Franchisees.

144. The Franchisors and their corresponding Franchisee(s) constituted an association of two or more persons/entities in the form of a continuous business relationship with the aim of ensuring the profitable operation of the subject properties.

145. Given these facts and circumstances, each Franchisor had constructive knowledge of K.S.'s trafficking (and the trafficking of others of others) through its agents, i.e., its corresponding Franchisee(s).

146. Given these facts and circumstances, each Franchisor is vicariously liable under principles of agency law and the doctrine of *respondeat superior* for each of its corresponding Franchisee'(s') relevant acts and omissions, as alleged herein, under federal common law and Ohio state law, including violations of 18 U.SC. §§ 1591 & 1595 (both perpetrator and beneficiary).

**COUNT 2: TVPRA Perpetrator Liability**
**Against ATIT Corporation**

147. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

148. At all times relevant hereto, ATIT Corporation owned and operated the Motel 6 in North Ridgeville.

149. 18 U.S.C. § 1591 criminalizes sex trafficking and 18 U.S.C. § 1595 provides a civil remedy for victims against perpetrators who violate 18 U.S.C. § 1591.

150. 18 U.S.C. § 1591 (via 18 U.S.C. § 1595) imposes civil liability on:

a. anyone who (i) knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any person (ii) knowing, or in reckless disregard of the fact, that force, fraud or coercion will be used to cause the person to engage in a commercial sex act; and/or

b. anyone who (i) benefits, financially or by receiving anything of value, from participation in a venture (i.e., knowingly assisting, supporting, or facilitating a venture) that (ii) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any person (iii) knowing, or in reckless disregard of the fact that force,

fraud or coercion will be used to cause the person to engage in a commercial sex act.

151. As alleged above, ATIT Corporation, through the owners, managers, and staff at the Motel 6 in North Ridgeville, knowingly harbored, provided, obtained, and maintained K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(1)).

152. As alleged above, Defendant ATIT Corporation, through the owners, managers, and staff at the Motel 6 in North Ridgeville, benefited (through room rentals at minimum) by knowingly assisting, supporting, and facilitating a venture with K.S.'s trafficker that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(2)).

153. As to harboring specifically, Defendant ATIT Corporation had actual knowledge of ongoing sex trafficking at its property, it actively facilitated such activity (i.e., made it easy or easier) and knowingly rented rooms to known traffickers, including Steven Gilbert – and continued to do so after Gilbert's conduct was manifest – while receiving revenue therefrom, including revenues from rooms in which K.S. was trafficked.

154. Defendant ATIT Corporation's acts and omissions demonstrated malice, oppression, and reckless indifference to the K.S.'s federally protected rights.

155. Defendant ATIT Corporation's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation,

loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.' "Prayer for Relief" below.

**COUNT 3: TVPRA Perpetrator Liability**
**Against Lake Erie Hospitality, LLC**

156. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

157. At all times relevant hereto, Lake Erie Hospitality, LLC owned and operated the Red Roof Inn in North Milan.

158. 18 U.S.C. § 1591 criminalizes sex trafficking and 18 U.S.C. § 1595 provides a civil remedy for victims against perpetrators who violate 18 U.S.C. § 1591.

159. 18 U.S.C. § 1591 (via 18 U.S.C. § 1595) imposes civil liability on:

a. anyone who (i) knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any person (ii) knowing, or in reckless disregard of the fact, that force, fraud or coercion will be used to cause the person to engage in a commercial sex act; and/or

b. anyone who (i) benefits, financially or by receiving anything of value, from participation in a venture (i.e., knowingly assisting, supporting, or facilitating a venture) that (ii) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any

person (iii) knowing, or in reckless disregard of the fact that force, fraud or coercion will be used to cause the person to engage in a commercial sex act.

160. As alleged above, Lake Erie Hospitality, LLC, through the owners, managers, and staff at the Red Roof Inn in North Milan, knowingly harbored, provided, obtained, and maintained K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(1)).

161. As alleged above, Defendant Lake Erie Hospitality, LLC, through the owners, managers, and staff at the Red Roof Inn in North Mlian, benefited (through room rentals at minimum) by knowingly assisting, supporting, and facilitating a venture with K.S.'s trafficker that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(2)).

162. As to harboring specifically, Defendant Lake Erie Hospitality, LLC had actual knowledge of ongoing sex trafficking at its property, it actively facilitated such activity (i.e., made it easy or easier) and knowingly rented rooms to known traffickers, including Steven Gilbert – and continued to do so after Gilbert's conduct was manifest – while receiving revenue therefrom, including revenues from rooms in which K.S. was trafficked.

163. Defendant Lake Erie Hospitality, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to the K.S.'s federally protected rights.

164. Defendant Lake Erie Hospitality, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic

losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.' "Prayer for Relief" below.

**COUNT 4: TVPRA Perpetrator Liability**
**Against Shri Gopi, LLC**

165. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

166. At all times relevant hereto, Shri Gopi, LLC owned and operated the Knights Inn in Elyria.

167. 18 U.S.C. § 1591 criminalizes sex trafficking and 18 U.S.C. § 1595 provides a civil remedy for victims against perpetrators who violate 18 U.S.C. § 1591.

168. 18 U.S.C. § 1591 (via 18 U.S.C. § 1595) imposes civil liability on:

a. anyone who (i) knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any person (ii) knowing, or in reckless disregard of the fact, that force, fraud or coercion will be used to cause the person to engage in a commercial sex act; and/or

b. anyone who (i) benefits, financially or by receiving anything of value, from participation in a venture (i.e., knowingly assisting, supporting,

> or facilitating a venture) that (ii) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits any person (iii) knowing, or in reckless disregard of the fact that force, fraud or coercion will be used to cause the person to engage in a commercial sex act.

169. As alleged above, Shri Gopi, LLC, through the owners, managers, and staff at the Knights Inn in Elyria, knowingly harbored, provided, obtained, and maintained K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(1)).

170. As alleged above, Shri Gopi, LLC, through the owners, managers, and staff at the Knights Inn in Elyria, benefited (through room rentals at minimum) by knowingly assisting, supporting, and facilitating a venture with K.S.'s trafficker that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited K.S. knowing, or in reckless disregard of the fact, that force, fraud, or coercion would be used to cause K.S. to engage in a commercial sex act. (18 U.S.C. § 1591(a)(2)).

171. As to harboring specifically, Shri Gopi, LLC had actual knowledge of ongoing sex trafficking at its property, it actively facilitated such activity (i.e., made it easy or easier) and knowingly rented rooms to known traffickers, including Steven Gilbert – and continued to do so after Gilbert's conduct was manifest – while receiving revenue therefrom, including revenues from rooms in which K.S. was trafficked.

172. Defendant Shri Gopi, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to the K.S.'s federally protected rights.

173. Shri Gopi, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.' "Prayer for Relief" below.

**COUNT 5: TVPRA Beneficiary Liability Claim**
**Against DHJR Hospitality, LLC**

174. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

175. At all times relevant hereto, Defendant DHJR Hospitality, LLC owned and operated the Motel 6 in Amherst.

176. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

177. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

178. As alleged above:

a. DHJR Hospitality, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because DHJR Hospitality, LLC and Gilbert were associated in fact and DHJR Hospitality, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. DHJR Hospitality, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. DJHR Hospitality, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

179. Defendant DHJR Hospitality, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

180. Defendant DHJR Hospitality, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic

losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 6: TVPRA Beneficiary Liability Claim**
**Against ATIT Corporation**

181. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

182. At all times relevant hereto, Defendant ATIT Corporation owned and operated the Motel 6 in North Ridgeville.

183. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

184. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

185. As alleged above:

a. ATIT Corporation participated in a venture with K.S.'s trafficker Steven Gilbert because ATIT Corporation and Gilbert were associated in fact and ATIT Corporation took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. ATIT Corporation knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. ATIT Corporation attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

186. Defendant ATIT Corporation's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

187. Defendant ATIT Corporation's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-

related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 7: TVPRA Beneficiary Liability Claim**
**Against S&S Realty, LTD**

188. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

189. At all times relevant hereto, Defendant S&S Realty, LTD owned and operated the Motel 6 in Milan, Ohio.

190. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

191. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

192. As alleged above:

a. S&S Realty, LTD participated in a venture with K.S.'s trafficker Steven Gilbert because S&S Realty, LTD and Gilbert were associated in fact and S&S Realty, LTD took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. S&S Realty, LTD knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. S&S Realty, LTD attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

193. Defendant S&S Realty, LTD's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

194. Defendant S&S Realty, LTD's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 8: TVPRA Beneficiary Liability Claim**
**Against Shri Gopi, LLC**

195. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

196. At all times relevant hereto, Defendant Shri Gopi, LLC owned and operated the Knights Inn in Elyria, Ohio.

197. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

198. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

199. As alleged above:

a. Shri Gopi, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because Shri Gopi, LLC and Gilbert were associated in fact and Shri Gopi, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Shri Gopi, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring,

transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Shri Gopi, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

200. Defendant Shri Gopi, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

201. Defendant Shri Gopi, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 9: TVPRA Beneficiary Liability Claim**
**Against UJAM, LLC**

202. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

203. At all times relevant hereto, Defendant UJAM, LLC owned and operated the Red Roof Inn in Elyria, Ohio.

204. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

205. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

206. As alleged above:

a. UJAM, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because UJAM, LLC and Gilbert were associated in fact and UJAM, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. UJAM, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. UJAM, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental

revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

207. Defendant UJAM, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

208. Defendant UJAM, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 10: TVPRA Beneficiary Liability Claim**
**Against Lake Erie Hospitality, LLC**

209. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

210. At all times relevant hereto, Defendant Lake Erie Hospitality, LLC owned and operated the Red Roof Inn in North Milan, Ohio.

211. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a

violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

212. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

213. As alleged above:

a. Lake Erie Hospitality, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because Lake Erie Hospitality, LLC and Gilbert were associated in fact and Lake Erie Hospitality, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Lake Erie Hospitality, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Lake Erie Hospitality, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

214. Defendant Lake Erie Hospitality, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

215. Defendant Lake Erie Hospitality, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 11: TVPRA Beneficiary Liability Claim**
**Against Tiger Cleveland**

216. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

217. At all times relevant hereto, Defendant Tiger Cleveland owned and operated the WoodSprings Suites in Avon, Ohio.

218. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of

recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

219. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

220. As alleged above:

a. Tiger Cleveland participated in a venture with K.S.'s trafficker Steven Gilbert because Tiger Cleveland and Gilbert were associated in fact and Tiger Cleveland took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Tiger Cleveland knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Tiger Cleveland attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

221. Defendant Tiger Cleveland's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

222. Defendant Tiger Cleveland's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses,

including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 12: TVPRA Beneficiary Liability Claim**
**Against NIMU, LLC**

223. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

224. Between October 29, 2020 and December 2021, Defendant NIMU, LLC owned and operated the Sprucewood Inn in Elyria, Ohio.

225. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

226. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

227. As alleged above:

a. NIMU, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because NIMU, LLC and Gilbert were associated in fact and NIMU, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. NIMU, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. NIMU, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

228. Defendant NIMU, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

229. Defendant NIMU, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae

are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 13: TVPRA Beneficiary Liability Claim**
**Against Lodging, LLC**

230. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

231. From January 2017 to October 29, 2020, Defendant Lodging, LLC owned and operated the Sprucewood Inn in Elyria, Ohio.

232. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

233. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

234. As alleged above:

a. Lodging, LLC participated in a venture with K.S.'s trafficker Steven Gilbert because Lodging, LLC and Gilbert were associated in fact and Lodging, LLC took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Lodging, LLC knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Lodging, LLC attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

235. Defendant Lodging, LLC's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

236. Defendant Lodging, LLC's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 14: TVPRA Beneficiary Liability Claim**
**Against HMVS, Inc.**

237. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

238. At all times relevant hereto, Defendant HMVS, Inc. owned and operated the Sunset Motel in Oberlin, Ohio.

239. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

240. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

241. As alleged above:

a. HMVS, Inc. participated in a venture with K.S.'s trafficker Steven Gilbert because HMVS, Inc. and Gilbert were associated in fact and HMVS, Inc. took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. HMVS, Inc. knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring,

transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. HMVS, Inc. attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

242. Defendant HMVS, Inc.'s acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

243. Defendant HMVS, Inc.'s acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 15: TVPRA Beneficiary Liability Claim**
**Against Jai Mata Di, Inc. (Praise the Lord)**

244. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

245. At all times relevant hereto, Defendant Jai Mata Di, Inc. (Praise the Lord) owned and operated the The Camelot in Elyria, Ohio.

246. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

247. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

248. As alleged above:

a. Jai Mata Di, Inc. (Praise the Lord) participated in a venture with K.S.'s trafficker Steven Gilbert because Jai Mata Di, Inc. (Praise the Lord) and Gilbert were associated in fact and Jai Mata Di, Inc. (Praise the Lord) took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Jai Mata Di, Inc. (Praise the Lord) knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Jai Mata Di, Inc. (Praise the Lord) attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

249. Defendant Jai Mata Di, Inc. (Praise the Lord)'s acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

250. Defendant Jai Mata Di, Inc. (Praise the Lord)'s acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 16: TVPRA Beneficiary Liability Claim**
**Against Patel & Patel, d/b/a Journey Inn**

251. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

252. At all times relevant hereto, Defendant Patel & Patel owned and operated the The Journey Inn in Elyria, Ohio.

253. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

254. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

255. As alleged above:

a. Patel & Patel participated in a venture with K.S.'s trafficker Steven Gilbert because Patel & Patel and Gilbert were associated in fact and Patel & Patel took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. Patel & Patel knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. Patel & Patel attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental

revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

256. Defendant Patel & Patel's acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

257. Defendant Patel & Patel's acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 17: TVPRA Beneficiary Liability Claim**
**Against A S F Inc.**

258. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

259. At all times relevant hereto, Defendant A S F Inc. owned and operated the Motel 9 in Elyria, Ohio.

260. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that the person knew or should have known committed "an act" that violated (including one that assisted, supported, or facilitated a

violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

261. K.S. is a victim of sex trafficking with the meaning of 18 U.S.C. §§ 1591 and 1595.

262. As alleged above:

a. A S F Inc. participated in a venture with K.S.'s trafficker Steven Gilbert because A S F Inc. and Gilbert were associated in fact and A S F Inc. took part in a continuous business relationship and, furthermore, did so with the expectation of gain;

b. A S F Inc. knew or should have known that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintain, patronizing, or soliciting any person to engage in a commercial sex act); and

c. A S F Inc. attempted to benefit and in fact benefited by its participation in the venture by, at the very least, realizing room rental revenues generated by the venture, including revenues from the rental of rooms in which K.S. and the other victims were trafficked.

263. Defendant A S F Inc.'s acts and omissions demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

264. Defendant A S F Inc.'s acts, omissions, and violations of the TVPRA directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, ad other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S's "Prayer for Relief" below.

**COUNT 18: TVPRA Beneficiary Liability Claim**
**Against G6 Franchisors**

265. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

266. At all times relevant hereto, the G6 Franchisors franchised and controlled all relevant operations at the three Motel 6 hotels where K.S. was trafficked.

267. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that person knew or should have known committed "an act" that violated (including one that assisted, supported or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

268. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595.

269. Venture 1: Based on the facts alleged throughout this complaint:

a. The G6 Franchisors participated in a venture with all corporate and franchised Motel 6 and Studio 6 properties in the United States because the G6 Franchisors were associated in fact with all such properties and took part in a continuous business relationship with them and, furthermore, did so with the expectation of gain. The G6 Franchisors' business model and their entire business enterprise is not their relationship with any given property, but their relationship with, and uniform right to control, all such properties.

b. In turn, many of those property owners/franchisees – including the subject Motel 6 Franchisees in this action – participated in ventures with sex traffickers because they and sex traffickers (including the G6 Franchisees and Gilbert in this action), were associated in fact and the properties took part in continuous business relationships with the traffickers and, furthermore, did so with the expectation of gain.

c. The G6 Franchisor had actual knowledge of trafficking on many of these properties as alleged above and otherwise should have known of trafficking on Motel 6/Studio 6 properties and, therefore, that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting,

enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The G6 Franchisors attempted to benefit and in fact benefited by participation in the venture through receipt of revenues and other royalties and fees, including room revenues from rooms rented for the purpose of sex trafficking. The G6 Franchisors also benefited by failure to adopt, implement, and enforce anti-trafficking measures in the operation of this venture inasmuch as every hotel added to or retained in a portfolio of franchised properties expands a franchisor's geographic footprint and market share without requiring additional capital investment which, in turn, enhances brand recognition, expands loyalty program participation, and strengthens the franchisor's negotiating power in all aspect of its business.

270. Venture 2: Based on the facts alleged throughout this complaint:

a. The G6 Franchisors participated in a venture with each of and all three Motel 6 Franchisees named as Defendants in this action because they were associated in fact with these properties, took part in a continuous business relationship with each and, furthermore, did so with the expectation of gain.

b. In turn, each Motel 6 Franchisee participated in a venture with K.S.'s trafficker Steven Gilbert because each Franchisee and Gilbert were associated in fact and took part in a continuous business relationship

and, furthermore, did so with the expectation of gain, which each in fact realized.

c. The G6 Franchisors knew or should have known that each of these ventures independently, and all three taken together, engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The G6 Franchisors attempted to benefit and in fact benefited by their participation in each of these ventures and all of them by, at the very least, realizing room rental revenues generated by each Motel 6 Franchisee, including revenues from the rental of rooms in which K.S. and Gilbert's other victims were trafficked, as well as receipt of other royalties and fees.

271. Furthermore, the G6 Franchisors are vicariously liable for the acts and omissions, including TVPRA violations, of each of the Motel 6 Franchisees.

272. The G6 Franchisors' acts and omissions and each of the ventures alleged above independently demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

273. The G6 Franchisors' acts, omissions, and violations of the TVPRA and each of the ventures alleged above directly and proximately caused K.S. to incur substantial economic

and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.'s "Prayer for Relief" below.

**COUNT 19: TVPRA Beneficiary Liability Claim**
**Against Red Lion Franchisor**

274. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

275. At all times relevant hereto, the Red Lion Franchisor franchised and controlled all relevant operations at the Knights Inn hotel where K.S. was trafficked.

276. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that person knew or should have known committed "an act" that violated (including one that assisted, supported or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

277. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595.

278. Venture 1: Based on the facts alleged throughout this complaint:

a. The Red Lion Franchisor participated in a venture with all corporate and franchised Knights Inn properties in the United States because the Red Lion Franchisor was associated in fact with all such properties and took part in a continuous business relationship with them and, furthermore, did so with the expectation of gain. The Red Lion Franchisor's business model and entire business enterprise is not its relationship with any given property, but its relationship with, and uniform right to control, all such properties.

b. In turn, many of those property owners/franchisees – including the subject Red Lion Franchisee in this action – participated in ventures with sex traffickers because they and sex traffickers (including the Red Lion Franchisee and Gilbert in this action), were associated in fact and the properties took part in continuous business relationships with the traffickers and, furthermore, did so with the expectation of gain.

c. The Red Lion Franchisor had actual knowledge of trafficking on many of these properties as alleged above and otherwise should have known of trafficking on Knights Inn properties and, therefore, that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Red Lion Franchisor attempted to benefit and in fact benefited by participation in the venture through receipt of revenues and other royalties and fees, including room revenues from rooms rented for the purpose of sex trafficking. The Red Lion Franchisor also benefited by failure to adopt, implement, and enforce anti-trafficking measures in the operation of this venture inasmuch as every hotel added to or retained in a portfolio of franchised properties expands a franchisor's geographic footprint and market share without requiring additional capital investment which, in turn, enhances brand recognition, expands loyalty program participation, and strengthens the franchisor's negotiating power in all aspect of its business.

279. Venture 2: Based on the facts alleged throughout this complaint:

a. The Red Lion Franchisor participated in a venture with the Red Lion Franchisee named as a Defendant in this action because they were associated in fact with these properties, took part in a continuous business relationship with each and, furthermore, did so with the expectation of gain.

b. In turn, the Red Lion Franchisee participated in a venture with K.S.'s trafficker Steven Gilbert because the Red Lion Franchisee and Gilbert were associated in fact and took part in a continuous business relationship and, furthermore, did so with the expectation of gain, which each in fact realized.

c. The Red Lion Franchisors knew or should have known that each of these ventures independently, and all three taken together, engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Red Lion Franchisors attempted to benefit and in fact benefited by their participation in each of these ventures and all of them by, at the very least, realizing room rental revenues generated by the Red Lion Franchisee, including revenues from the rental of rooms in which K.S. and Gilbert's other victims were trafficked, as well as receipt of other royalties and fees.

280. Furthermore, the Red Lion Franchisor is vicariously liable for the acts and omissions, including TVPRA violations, of each of the Red Lion Franchisees.

281. The Red Lion Franchisor's acts and omissions and each of the ventures alleged above independently demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

282. The Red Lion Franchisor's acts, omissions, and violations of the TVPRA and each of the ventures alleged above directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological

trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.'s "Prayer for Relief" below.

**COUNT 20: TVPRA Beneficiary Liability Claim Against Red Roof Franchisors**

283. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

284. At all times relevant hereto, the Red Roof Franchisors franchised and controlled all relevant operations at the two Red Roof Inn hotels where K.S. was trafficked.

285. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that person knew or should have known committed "an act" that violated (including one that assisted, supported or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

286. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595.

287. Venture 1: Based on the facts alleged throughout this complaint:

a. The Red Roof Franchisors participated in a venture with all corporate and franchised Red Roof Inn properties in the United States because the Red Roof Franchisors were associated in fact with all such properties and took part in a continuous business relationship with them and, furthermore, did so with the expectation of gain. The Red Roof Franchisors' business model and their entire business enterprise is not their relationship with any given property, but their relationship with, and uniform right to control, all such properties.

b. In turn, many of those property owners/franchisees – including the subject Red Roof Franchisees in this action – participated in ventures with sex traffickers because they and sex traffickers (including the Red Roof Franchisees and Gilbert in this action), were associated in fact and the properties took part in continuous business relationships with the traffickers and, furthermore, did so with the expectation of gain.

c. The Red Roof Franchisors had actual knowledge of trafficking on many of these properties as alleged above and otherwise should have known of trafficking on Red Roof properties and, therefore, that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Red Roof Franchisors attempted to benefit and in fact benefited by participation in the venture through receipt of revenues and other royalties and fees, including room revenues from rooms rented for the purpose of sex trafficking. The Red Roof Franchisors also benefited by failure to adopt, implement, and enforce anti-trafficking measures in the operation of this venture inasmuch as every hotel added to or retained in a portfolio of franchised properties expands a franchisor's geographic footprint and market share without requiring additional capital investment which, in turn, enhances brand recognition, expands loyalty program participation, and strengthens the franchisor's negotiating power in all aspect of its business.

288. Venture 2: Based on the facts alleged throughout this complaint:

a. The Red Roof Franchisors participated in a venture with each of the Red Roof Franchisees named as Defendants in this action because they were associated in fact with these properties, took part in a continuous business relationship with each and, furthermore, did so with the expectation of gain.

b. In turn, each Red Roof Franchisee participated in a venture with K.S.'s trafficker Steven Gilbert because each Franchisee and Gilbert were associated in fact and took part in a continuous business relationship and, furthermore, did so with the expectation of gain, which each in fact realized.

c. The Red Roof Franchisors knew or should have known that each of these ventures independently, and all three taken together, engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Red Roof Franchisors attempted to benefit and in fact benefited by their participation in each of these ventures and all of them by, at the very least, realizing room rental revenues generated by each Red Roof Franchisee, including revenues from the rental of rooms in which K.S. and Gilbert's other victims were trafficked, as well as receipt of other royalties and fees.

289. Furthermore, the Red Roof Franchisors are vicariously liable for the acts and omissions, including TVPRA violations, of each of the Red Roof Franchisees.

290. The Red Roof Franchisors' acts and omissions and each of the ventures alleged above independently demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

291. The Red Roof Franchisors' acts, omissions, and violations of the TVPRA and each of the ventures alleged above directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological

trauma, loss of dignity, humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.'s "Prayer for Relief" below.

**COUNT 21: TVPRA Beneficiary Liability Claim Against Choice Franchisors**

292. K.S. realleges and incorporates all previous allegations as though fully set forth herein.

293. At all times relevant hereto, the Choice Franchisors franchised and controlled all relevant operations at the Woodsprings hotel where K.S. was trafficked.

294. 18 U.S.C. § 1595 provides a civil remedy for sex trafficking victims against anyone who (i) knowingly benefited or attempted to benefit financially or by receiving anything of value (ii) from participation in a venture (iii) that person knew or should have known committed "an act" that violated (including one that assisted, supported or facilitated a violation) of 18 U.S.C. § 1591 (including "an act" of force, fraud or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

295. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595.

296. Venture 1: Based on the facts alleged throughout this complaint:

a. The Choice Franchisors participated in a venture with all corporate and franchised Choice properties in the United States because the Choice Franchisors were associated in fact with all such properties and took part in a continuous business relationship with them and, furthermore, did so with the expectation of gain. The Choice Franchisors' business model and their entire business enterprise is not their relationship with any given property, but their relationship with, and uniform right to control, all such properties.

b. In turn, many of those property owners/franchisees – including the subject Choice Franchisees in this action – participated in ventures with sex traffickers because they and sex traffickers (including the Choice Franchisees and Gilbert in this action), were associated in fact and the properties took part in continuous business relationships with the traffickers and, furthermore, did so with the expectation of gain.

c. The Choice Franchisors had actual knowledge of trafficking on many of these properties as alleged above and otherwise should have known of trafficking on Choice properties and, therefore, that the venture engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Choice Franchisors attempted to benefit and in fact benefited by participation in the venture through receipt of revenues and other royalties and fees, including room revenues from rooms rented for the purpose of sex trafficking. The Choice Franchisors also benefited by failure to adopt, implement, and enforce anti-trafficking measures in the operation of this venture inasmuch as every hotel added to or retained in a portfolio of franchised properties expands a franchisor's geographic footprint and market share without requiring additional capital investment which, in turn, enhances brand recognition, expands loyalty program participation, and strengthens the franchisor's negotiating power in all aspect of its business.

297. Venture 2: Based on the facts alleged throughout this complaint:

a. The Choice Franchisors participated in a venture with the Choice Franchisees named as Defendants in this action because they were associated in fact with these properties, took part in a continuous business relationship with each and, furthermore, did so with the expectation of gain.

b. In turn, the Choice Franchisee participated in a venture with K.S.'s trafficker Steven Gilbert because the Franchisee and Gilbert were associated in fact and took part in a continuous business relationship and, furthermore, did so with the expectation of gain, which each in fact realized.

c. The Choice Franchisors knew or should have known that each of these ventures independently, and all three taken together, engaged in "an act" that violated (including any act that assisted, supported, or facilitated a violation of) 18 U.S.C. § 1591 (i.e., an act of force, fraud, or coercion for the purpose of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting any person to engage in a commercial sex act).

d. The Choice Franchisors attempted to benefit and in fact benefited by their participation in each of these ventures and all of them by, at the very least, realizing room rental revenues generated by the Choice Franchisee, including revenues from the rental of rooms in which K.S. and Gilbert's other victims were trafficked, as well as receipt of other royalties and fees.

298. Furthermore, the Choice Franchisors are vicariously liable for the acts and omissions, including TVPRA violations, of the Choice Franchisees.

299. The Choice Franchisors' acts and omissions and each of the ventures alleged above independently demonstrated malice, oppression, and reckless indifference to K.S.'s federally protected rights.

300. The Choice Franchisors' acts, omissions, and violations of the TVPRA and each of the ventures alleged above directly and proximately caused K.S. to incur substantial economic and non-economic losses, including (a) bodily injury and associated pain and suffering; (b) past, present, and future mental anguish and emotional distress, psychological trauma, loss of dignity,

humiliation, degradation, loss of enjoyment of life, and loss of the capacity to enjoy life; and (c) past, present, and future costs for medical care and treatment, including mental health counseling, treatment, trauma-related services, medications, and other related out-of-pocket expenses. These injuries and their sequelae are continuing and will continue into the future. Accordingly, K.S. seeks all available compensation and restitution for these losses available at law or in equity, including all relief set forth in K.S.'s "Prayer for Relief" below.

**PRAYER FOR RELIEF**

301. WHEREFORE, K.S. requests judgment against Defendants, jointly and severally, for damages in excess of the minimum jurisdictional limits, including:

a) Actual Damages;

b) Compensatory Damages;

c) Mental anguish, emotional distress, and pain and suffering damages;

d) Damages for Loss of Earnings and Loss of Earnings Capacity;

e) Damages for Medical Expenses;

f) Damages for Future Life Care;

g) Punitive Damages;

h) Attorneys' fees and expenses;

i) Costs of the action;

j) Pre- and post-judgment interest; and

k) Any other relief available at law or in equity.

**JURY DEMAND**

K.S. demands a jury trial on all issues so triable.

**CONSTANT LEGAL GROUP**

/s/ *Edward J. Kelley*
Ryan J. Cavanaugh (0079996)
Constantine P. Venizelos (0078596)
Edward J. Kelley (0096082)
737 Bolivar Rd., Ste. 440
Cleveland, OH 44115
(855) 906-2561
(216) 274-9365 (facsimile)
ryan@constantlg.com
dean@constantlg.com
ed@constantlg.com

*Attorneys for Plaintiff*